David A. Einhorn (CT 09458)
James M. Andriola (CT 22742)
Anderson Kill & Olick, P.C.
Two Sound View Drive
Greenwich, Connecticut 06830
(203) 622-7688

- and -

Anderson Kill & Olick, P.C.
1251 Avenue of the Americas
New York, New York  10022
(212) 278-1000

Attorneys for Plaintiff Savin Corporation

## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| SAVIN CORPORATION,<br><br>                              Plaintiff,<br><br>- v -<br><br>THE SAVIN CENTER, P.C.<br><br>                              Defendant. | Case No. 302 CV 2297 (AVC) |

## MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S MOTION FOR LEAVE TO AMEND THE ANSWER TO ADD A COUNTERCLAIM

Plaintiff Savin Corporation ("Savin") respectfully submits this memorandum of law in opposition to the motion of the Defendant The Savin Center, P.C.'s ("Defendant") for leave to amend the Answer to add counterclaims ("Motion"). Defendant's Motion should be denied because it is futile and fails to meet the standards of pleading as set out in Rules 8 and 9 of the Federal Rules of Civil Procedure ("FRCP").

:716212-2

# I.
## PRELIMINARY STATEMENT

This case involves, <u>inter alia</u>, the dilution of Plaintiff's marks by the Defendant. The Defendant now seeks to add two counterclaims to cancel the trademarks-in-suit on the grounds of abandonment and fraud. The first counterclaim purports to allege abandonment based on an alleged assignment-in-gross and/or naked license. The Defendant appears to claim that three of Savin's trademarks-in-suit[1] were abandoned when the trademarks were assigned by Savin, and/or when those marks were licensed-back to Savin, as collateral for a loan to a financial institution, Foothill Capital Corporation ("Foothill"). There can be no abandonment, because at all times the goodwill accompanied ownership of the transferred trademarks, there was a continuity of the goods, requisite quality controls were in place and the Assigned Marks have retained their significance as trademarks. The proposed counterclaim does not and cannot allege facts contrary to those facts.

As explained below, the Defendant has already deposed a witness from Foothill about the allegedly improper transaction. The transcript from that deposition and the documentation of that transaction support the conclusion that the assignment and license-back, and the subsequent re-assignment, were proper. The evidence already gathered by the Defendant, including the Assignment itself which the Defendant did not attach to the proposed counterclaims, demonstrates that the Defendants proposed amendment would be futile.

---

[1] The marks included in the Assignment that are alleged by Savin in this case are: SAVIN Reg. No. 836,540, SAVIN (new logo) Reg. No. 1,174,900, SAVIN Reg. No. 1,500,782 and SAVINFAX Reg. No. 1,514,474, ("the Assigned Marks").

The second counterclaim purports to allege fraud on the U.S. Patent and Trademark Office ("PTO") by Savin's attorneys. The allegations fail to meet the requirements of the FRCP that require fraud to be pled with particularity. In addition, the Defendant's claim of fraud on the PTO would be futile. The allegations of misrepresentation and fraud fail to even allege a factual, let alone material, misrepresentation. The allegation that Savin's counsel caused the PTO to grant a registration is conspicuously without factual basis. The allegations conveniently omit that the PTO had access to all, if not more, relevant documentation than did Savin's attorney. The allegations do not, and cannot, meet the required pleading standard for a claim of fraud. The second counterclaim fails to state a claim for fraud and any amendment would be futile if permitted.

## II.
## PROCEDURAL HISTORY

On December 26, 2003, Savin filed a complaint against the Defendant based on the Federal Anti-Dilution Act (15 U.S.C. §1125(c)), the Connecticut Anti-Dilution Statute (Conn. Gen. Stat. §35-11i) and the Connecticut Unfair Trade Practices Act (Conn. Gen. Stat. §42-11-a et seq.) (the "Complaint"). On April 3, 2003, Savin amended the Complaint as a matter of right, prior to the Defendant filing any Answer. On April 28, 2003, the Defendant filed a motion to dismiss the Amended Complaint. Savin has opposed that motion and the Court has taken it under advisement. On June 25, 2003, the Defendant filed its Answer.

At present, discovery is ongoing. Written discovery already has been exchanged. Depositions are going forward. Each party already has taken the other's deposition pursuant to Rule 30(b)(6) of the FRCP, the Defendant has taken a third-party deposition pursuant to Rule 45 of the FRCP and other witnesses have been deposed by the Defendant.

## III.
## FACTUAL BACKGROUND

**A.    The Foothill Transaction Did Not Result In Abandonment**

The Defendant fails to allege facts that can support a claim of abandonment by either assignment-in-gross or by naked licensing.  The allegations also ignore the clear wording of the Assignment and the testimony taken by Defendant of a knowledgeable witness.

1.    Defendant's Deficient Allegations

The Defendant fails to allege facts that can support a claim of abandonment by either assignment-in-gross or by naked licensing.  The Defendant alleges that Savin continued to use the Assigned Marks even after the Assignment to Foothill, that Foothill did not use the marks and that Foothill's intended interest was to secure its collateral.[2]  The pleading then states in conclusory fashion that the Assignment "was therefore an assignment in gross."[3]

The Defendant next alleges that during the term of the Assignment, Savin "used the [Assigned Marks] in association with goods and services," that Foothill "never inspected the quality of goods or services" and that the Assigned Marks were thus "abandoned by [Foothill] by its failure to exercise any quality control."[4]  The Defendant never alleges that there was any disruption in the continuity of the goods and services provided by Savin and never alleges that the Assigned Marks lost any significance as trademarks.

In addition to these allegations, the parties have exchanged discovery pertinent to this counterclaim and the Defendant deposed Foothill concerning the Assignment.

---

[2] See Proposed Defendant's Answer to Amended Complaint and Petition to Cancel ("Proposed Answer") at ¶¶ 8, 9 & 10.  A copy of the Proposed Answer is annexed to the Defendant's Motion as Exhibit 1.
[3] See id. at ¶ 11.
[4] See id. at ¶¶ 15, 16 & 19.

2.    The Assignment And License-Back Agreement

Effective January 13, 1988, Savin entered into a loan agreement with Foothill that included, among other things, an agreement entitled "Trademarks and Letters Patent Assignment"(the "Assignment").  It assigned to Foothill and licensed-back to Savin Savin's intellectual property as it existed at that time, which included the Assigned Marks. [5]

The Assignment provides:

> [Savin] assigns and conveys and transfers unto [Foothill] ... upon the terms and conditions contained in the Agreements, and as security for payment and performance ... all of [Savin's] right title and interest in, to and under the Trademarks, *together with the goodwill* ... and the registrations thereof ... provided, however, that until the occurrence ... of Default, ... [Savin] *shall be licensed* by [Foothill] to continue to use the Trademarks and Letters Patent in its business as if it had not made this Assignment.[6]

The license-back provision states:

> 7.    Unless and until ... an Event of Default ... [Foothill] hereby grants to [Savin] the exclusive, royalty-free, nontransferrable right and license to ... use ... goods marked or identified by the Trademarks .... The parties agree that all use of the Trademarks by [Savin] shall inure to the benefit of [Foothill].  [Savin] agrees that for so long as this license shall remain in effect, [Savin] shall at all times maintain the quality of all goods marked or identified by the Trademarks. In furtherance of the license granted by [Foothill] to [Savin] pursuant to this paragraph, but solely in connection with the monitoring of the financing arrangements created by the Agreements, [Foothill] *shall have the right, no more than semi-annually, upon prior oral or written notice to [Savin], to examine, at [Savin's] expense, [Savin's] quality standards with respect to the manufacture, use and sale of goods marked or identified by the Trademarks*; provided, however, that [Savin] agrees that it shall be [Savin's] responsibility, and in no way [Foothill's], to maintain such quality standards at all times.[7]

The Assignment specifically assigns the trademarks with goodwill.  The license specifically provides for Foothill to monitor the quality of the goods manufactured by Savin.  It also states that the purpose of the agreement is to perfect a security interest in the Assigned Marks.

---

[5] A copy of the Assignment (Bates Stamp No. SVN01072-84) is annexed as "Exhibit 1" to the accompanying affirmation of David A. Einhorn, dated February 18, 2004 ("Einhorn Aff.").
[6] Id. at pp. 1-2, ¶ 2 (emphasis added).
[7] Id. at p. 3, ¶ 7 (emphasis added).

The Assignment remained in effect until December 18, 1995, when the Assigned Marks were assigned back to Savin.[8] This second assignment was recorded in the PTO on March 11, 1996.[9]

> 3.  Defendant's Deposition of Foothill

On January 20, 2004, Defendant took the deposition of Michael Fishman ("Fishman"), current Executive Vice-President of Wells-Fargo Foothill.[10] Fishman was a Loan Portfolio Manager and the National Underwriting Manager for Foothill during the effective period of the Assignment.[11] He testified that the intent of the Assignment was to perfect Foothill's security interest in the Assigned Marks as collateral.[12] Although he repeatedly stated that he did not recall many details, he testified that Foothill's "Audit Group" inspected Savin's inventory when the Assignment took place.[13] He could not recall whether the quality of the goods was specifically inspected.[14] Foothill used the Assigned Marks through its licensee Savin, which continuously used them on the same goods of the same quality.[15]

**B.  The Defendant Has Failed To Properly Allege Fraud On The PTO**

The Defendant's allegations of fraud on the PTO are not pled properly. The obvious facts pertaining to those allegations demonstrate that Defendant's position is baseless and that adding the counterclaim would be futile.

---

[8] A copy of the re-assignment from Foothill to Savin (Bates Stamp No. SVN01088-90) is annexed as "Exhibit 2" to the Einhorn Aff.
[9] A copy of the document reflecting recordation (Bates Stamp No. SVN01085-87) is annexed as "Exhibit 3" to the Einhorn Aff.
[10] The successor corporation to Foothill.
[11] See pp. 7-9 of the transcript of the deposition of Michael Fishman taken on January 20, 2004 ("Transcript"). A copy of the relevant pages of the transcript is annexed as "Exhibit 4" to the Einhorn Aff. ("Fishman Dep.")
[12] See Fishman Dep. at p. 29. Fishman also stated that collateral in which Foothill perfected its security did not appear as assets on the books of Foothill. Id. at 46.
[13] See Fishman Dep. at 49-50.
[14] Id.
[15] See Fishman Dep. at 47-48.

1.     Defendant's Allegations Are Not Properly Pled

As Defendant alleges, when the application for the trademark SAVIN for

facsimile machines (Reg. No. 2,230,303) (the "'303 Mark") was being prosecuted before the

PTO, Savin held a prior registration for the trademark SAVIN (Reg. No. 836,540) (the "'540

Mark"), among others.[16] In prosecuting the '303 Mark, David A. Einhorn ("Einhorn"), Savin's

attorney, spoke with the Examining Attorney at the PTO on or about December 8, 1998.[17] In a

letter that same day, Einhorn memorialized the conversation.[18] The Defendant concludes that the

statement was false, because it contends that the trademarks-in-suit, including the '540 Mark,

were all Section 2(f) registrations and that Einhorn did not inform the Examiner of that fact.[19]

The Defendant does not allege any of the substance of that conversation.

2.     Defendant's Allegations Ignore Obvious Facts

Neither the registration certificate of the '540 Mark nor the TARR database of the

PTO states anywhere that the '540 Mark is based on Section 2(f).[20] In addition, there is not a

single piece of correspondence in the PTO file history for the '540 Mark referring to or requiring

the applicant, Savin, to rely on Section 2(f).[21] The Examining Attorney had access to the file for

the '540 Mark.[22] The Examining Attorney had additional access to the PTO's extensive

databases. When Einhorn pointed out to the Examining Attorney that the '540 Mark did not

indicate a Section 2(f) basis, the Examining Attorney, after apparently conducting a review of

---

[16] See Proposed Answer at ¶¶ 22 & 30. A copy of the status copy of the trademark SAVIN (Reg. No. 836,540) is annexed as "Exhibit 5" to the Einhorn Aff. The '540 Mark was applied for on July 26, 1966 and the PTO granted registration on October 10, 1967. Another attorney at another law firm conducted the filing and prosecution of '540. The file pertaining to '540 was transferred to Einhorn at a much later time

[17] See Proposed Answer at ¶ 26.

[18] See id. at ¶¶ 26-28. A copy of the letter dated December 8, 1998 from Einhorn to the Examiner is annexed as "Exhibit 6" to the Einhorn Aff.

[19] See id. at ¶¶ 29-34.

[20] See Exhibit 5 to Einhorn Aff.

[21] See Einhorn Aff. at ¶¶ 4,5.

PTO files and/or databases, agreed.[23] The Defendant does not even allege any basis for why the Examiner would rely on counsel's opinion as to documents in the possession of the PTO. Defendant also does not attach a status copy of the Registration Certificate for the '540 Mark, which shows no section 2(f) basis.[24]

      3.    <u>The Facts Referenced By the Allegations Defeat the Defendant's Claim</u>

      The Defendant has not alleged any false statement or misrepresentation of fact on the part of Einhorn to the PTO. Einhorn's representation as to the contents of the '540 Mark's Registration Certificate is accurate, as plainly set forth on the face of that document.[25] Even assuming *arguendo* that a contrary interpretation of the file history of the application for the '540 mark can be made, there was no factual representation made by Einhorn -- only his legal opinion based on his review of the '540 Mark's Registration Certificate and a trademark database.

      Furthermore, the Examining Attorney had access to the original documentation and files regarding these applications and it can not follow, as alleged, that she would have relied on Einhorn's representation. The allegation in paragraph 24 that Einhorn somehow "authorized" the Examining Attorney to amend the application is simply bizarre.

**IV.**
**ARGUMENT**

**A.**    <u>**DEFENDANT HAS NOT MET ITS BURDEN UNDER RULE 15(a) OF THE FRCP**</u>

      The Defendant's Motion seeks to amend its answer and add counterclaims pursuant to Rule 15(a) of the FRCP. This rule provides that after twenty days from filing, "a party may amend the party's pleading only by leave of court or by written consent of the adverse

---

[22] <u>See</u> Einhorn Aff. at ¶ 7.
[23] A copy of the amendment issued by the Examiner is annexed to the Einhorn Aff. as "Exhibit 7".
[24] <u>See</u> Exhibit 5 to Einhorn Aff.
[25] <u>See</u> Exhibit 5 to Einhorn Aff

party." Fed. R. Civ. P. 15(a). Leave to amend may be denied for any reason, including undue delay, bad faith, dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to opposing party by virtue of allowance of amendment and *futility of amendment*. Foman v. Davis, 371 U.S. 178, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962) (emphasis supplied).

The Defendant's proposed counterclaims seek cancellation of the trademarks-in-suit based on purported fraud on the PTO and abandonment. As shown below, these allegations are improperly plead and contradict obvious and known facts as well as facts already discovered by the Defendant. The proposed amendments fail to state a proper claim and would be futile, therefore, leave to amend should be denied.

**B.    DEFENDANT'S COUNTERCLAIM FOR CANCELLATION BASED ON FRAUD SHOULD BE REJECTED.**

The Defendant's counterclaim alleging fraud on the PTO does not meet the heightened standard of pleading mandated by the FRCP. Moreover, it fails to set forth a cause of action and would be futile.

1.    The Claim Does Not Meet The Heightened Pleading Standard Of Rule 9(b) Of The FRCP.

a.    Fraud On The PTO

To state a claim of fraud on the PTO, it is essential that the allegations set forth: (1) a knowing, willful and intentional act of misrepresentation or omission before the PTO, (2) materiality of the misrepresentation or omission, and (3) actual reliance by the PTO upon the misrepresentation or omission (using a 'but for' standard). American Optical v. United States, 179 U.S.P.Q. 682, 684 (Ct. Cl. 1973), Union Carbide Corp. v. Dow Chem. Co., 619 F. Supp.

1036, 1051-52 (D. Del. 1985), cited in, General American Transportation Corp. v. Cryo-Trans, Inc., 159 F.R.D. 543 (D. Ore. 1995).

The misrepresentation must be made with a clear intent to deceive the Examiner and thereby cause the PTO to grant an invalid patent (Nobelpharma AB v. Implant Innovations, Inc., 141 F.3d 1059,1070, 46 U.S.P.Q.2d 1097 (Fed. Cir. 1998)), i.e., "the fact misrepresented must be 'the efficient, inducing, and proximate cause, or the determining ground' of the action taken in reliance thereon." Nobelpharma AB, 141 F.3d 1059,1070, 46 U.S.P.Q.2d 1097 (Fed. Cir. 1998), quoting, 37 C.J.S. Fraud 18 (1943). Failure to allege even one of the elements of fraud, defeats the fraud claim. Rambus, Inc. v. Infineon Technologies, Ag, 318 F.3d 1081 (Fed. Cir. 2003), citing, Bank of Montreal v. Signet Bank, 193 F.3d 818,826 (4th Cir. 1999). The Second Circuit has required that a party pleading fraud must allege facts that give rise to a "strong inference" of fraudulent intent. Shields v. Citytrust Bancorp, Inc., 25 F.3d 1124, 1127 (2d Cir. 1994), accord, Mills, 12 F.3d at 1176; O'Brien, 936 F.2d at 676; Ouakine v. McFarlane, 897 F.2d 75, 80 (2d Cir. 1990).

b.    Rule 9 Requires Pleading With Particularity

Rule 9(b) of the FRCP states that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." A party must plead fraud claims with greater specificity than other claims under Rule 8, because a party's reputation "from improvident charges of wrongdoing" should be safeguarded. O'Brien v. National Property Analysts Partners, 936 F.2d 674, 676 (2d. Cir. 1991), In re Stac Elecs. Secs. Litigation, 89 F.3d 1399, 1405 (9th Cir. 1996), quoted in, Rombach v. Chang, 2004 WL 77928 (2d.Cir. 2004)("Rule 9(b) serves to…prohibit plaintiffs from unilaterally imposing upon the court, the parties and society enormous social and economic costs absent some factual basis.")

The Second Circuit requires the who, what, when, where and why of a fraud claim to be set forth with particularity.  Mills v. Polar Molecular Corp., 12 F.3d 1170, 1175 (2d.Cir. 1993); VanDenBroeck v. Commonpoint Mortgage Co., 210 F.3d 696, 702 (6th Cir. 2000), reh'g denied (Feb 13, 2001).

    c.    The Claim Of Fraud Lacks Sufficient Particularity As It Does Not Allege Fraudulent Conduct

The Defendant's proposed allegations sounding in fraud are inadequate and fall short of the Rule 9 standard.  Einhorn's communication with the Examining Attorney as to the content of the Registration Certificate for the '540 Mark cannot be said to be a misrepresentation. As alleged by the Defendant, the Examining Attorney, who had access to the same documentation, not only apparently agreed with Einhorn's legal interpretation, but issued the registration for the '303 Mark.[26]  It is not possible that his conversation was a "knowing, willful and intentional act of misrepresentation or omission."[27]  The letter dated December 8, 1998, a confirmation of the conversation, similarly cannot constitute any misrepresentation.

The second and third elements of fraud on the PTO, namely, materiality of the misrepresentation and actual reliance by the PTO using a 'but-for' standard are not even alleged. The Defendant only asserts a bald allegation that "[t]he Registrant made the statement with the intent to induce the Examining Attorney to grant said registration without requiring a claim of benefit of Section 2(f), and, reasonably relying upon the truth of said false statements, the U.S. Patent and Trademark Office did, in fact, grant said registration."[28] The allegation is not supported by the facts alleged.

---

[26] See Proposed Answer at 18 (the heading for Count II is "Petition to Cancel U.S. Trademark Reg. No. 2,230,303").
[27] Id. at p. 20, ¶ 38.
[28] Id. at p. 20, ¶ 38.

Indeed, the Defendant cannot allege intent or reliance. The Examiner at the PTO had access to the complete file of the prosecution of the '540 Mark. During the telephone conversation Einhorn merely drew the Examiner's attention to various documents. The decision to remove the reference to Section 2(f) from the registration of the '303 Mark was made entirely by the Examiner based on the documents available to her. As one would expect, Einhorn could not possibly authorize the Examining Attorney to permit registration. Thus, the Defendant is unable to allege anything other than its conclusions. As the Defendant's pleadings fail to allege the elements of fraud on the PTO, they fail to satisfy the heightened specificity requirement of Rule 9(b) of the FRCP.

2.    <u>Allowing The Fraud Counterclaim Would Be Futile</u>

The Defendant's proposed counterclaim would be futile because it does not set forth facts sufficient to state a claim for fraud.

a.    <u>A Fraud Claim Must Be Supported By Evidence Showing Factual Misrepresentations.</u>

An amendment should not be permitted if it is futile or legally insufficient. <u>Foman v. Davis</u>, 371 U.S. 178, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962) (setting out a list of factors or reasons that a court may use to deny leave to amend). An amendment is futile if, <u>inter alia</u>, it fails to state a legal theory, or could not withstand a motion to dismiss. <u>Dougherty v. Town of North Hempstead Board of Zoning Appeals</u>, 282 F.3d 83 (2d Cir. 2002); <u>Oneida Indian Nation of New York v. City of Sherrill, New York</u>, 337 F.3d 139,168 (2d Cir. 2004) (denying leave to amend on the ground of futility because the proposed amendment would not withstand a motion to dismiss); <u>Lucente v. I.B.M., Corp.</u>, 310 F.3d 243,258 (2d Cir. 2002) (same). <u>Also see</u>, Moore, James W., Moore's Federal Practice § 15.15[3] (3d ed. 1998).

Defendant's purported claim of fraud on the PTO is futile, as it does not meet the elements listed in the previous section of this memorandum. The Second Circuit's requirement that a party pleading fraud must allege facts that give rise to a "strong inference" of fraudulent intent has not been met by the Defendant in this case. See Shields, 25 F.3d 1124, 1127 (2d Cir. 1994). In view of the serious lacunae in the Motion in that it fails to set forth and present the elements of a viable allegation of fraud, it is unlikely to withstand a motion to dismiss. Acito v. Imcera Group, Inc., 47 F.3d 47,54 (2d Cir. 1995) (court withheld leave to amend when proposed amendments would not have cured deficiencies in the complaint that failed to plead fraud with particularity).  Leave to amend the Answer to incorporate this deficient and futile counterclaim should be denied.

As demonstrated above by facts known to all parties, the Examining Attorney, based on her own authority, agreed with Einhorn's interpretation of the PTO files at issue.[29] Einhorn did not make any misrepresentations of fact to the Examiner and the Examiner did not rely on any factual representations made by Einhorn.[30]  This is sufficient to defeat the Defendant's conclusory allegations.

Even assuming *arguendo* that a different legal interpretation can be made of the same files, Einhorn was merely expressing legal conclusions based on his review of certificates of registration and trademark databases.  Such an expression is clearly legal in nature, opinion-based and cannot conceivably constitute a factual misrepresentation.

---

[29] See Exhibit 5 to the Einhorn Aff.
[30] See Einhorn Aff. at ¶¶ 7-9.

**C.    DEFENDANT'S COUNTERCLAIM FOR CANCELLATION BASED ON ABANDONMENT OF THE TRADEMARKS-IN-SUIT IS WITHOUT MERIT.**

The second proposed amendment is also futile because it fails to plead facts that would support a claim of abandonment of the trademarks. Therefore, the Defendant's purported claim would be futile and leave to amend should denied.

1.    The Standard For Futility

As stated in a preceding section, the U.S. Supreme Court has held that futility of the amendment is a reason to deny the movant leave to amend. Foman v. Davis, 371 U.S. 178, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962). An amendment is futile if, inter alia, it fails to state a legal theory, or could not withstand a motion to dismiss. Moore, James W., Moore's Federal Practice, §15.15[3] (3d ed. 1998).

2.    The Trademarks Have Not Been Assigned In Gross.

a.    Purpose Of The Law

While the case law dealing with such assignments in the context of security agreements is limited, courts generally are loath to find that there was assignment-in-gross if the parties were not intending one and there was a continuity of goods. Syntex Lab., Inc. v. Norwich Pharm. Co., 315 F. Supp. 45,56 (S.D.N.Y. 1970).  The Federal Circuit stated that a key objective of trademark law to protect consumers against confusion and thus the assignment-in-gross rule "reflects 'the need, if consumers are not to be misled from established associations with the mark, that it continue to be associated with the same or similar products." Visa, U.S.A., Inc. v. Birmingham Trust Nat'l Bank, 696 F.2d 1371 (Fed. Cir. 1982)(citing Raufast S.A. v. Kicker's Pizzazz, Ltd., 208 U.S.P.Q. 699, 702 (E.D.N.Y. 1980).  Visa upheld an assignment and license-back because the services provided to the cardholder (customer) by the assignor and assignee

remained functionally the same. Id. at 1376 (ignoring that the services provided by the assignee were slightly different from those provided by the assignor).

In Patterson Lab., Inc. v. Roman Cleanser Co., 802 F.2d 207, 208-09 (6th Cir. 1986), the court primarily focussed on the effect of an assignment from debtor to creditor when the debtor defaulted and whether it deceived the public. Id. (the creditor was not in the business of manufacturing the goods manufactured by the debtor). The court relied on the fact that the know-how and patents passed with the trademarks to uphold the assignment.[31]

Assignments with license-back provision are recognized as standard and valid transactions. Visa, 696 F.2d at 1375; McCarthy, J. Thomas, *McCarthy on Trademarks & Unfair Competition*, (4th ed. 2003) at § 18:9 (citing E. & J. Gallo Winery v. Gallo Cattle Company, 967 F.2d 1280 (9th Cir. 1992).[32] The focus in the E& J Gallo case was on the continuity of the goods involved. Id. at 1290.

Similarly, the Fifth Circuit found "it wholly anomalous to *presume* a loss of a trademark significance merely because [the assignor], in the course of diligently *protecting* its mark, entered into agreements designed to preserve the distinctiveness and strength of that mark." Exxon Corp. v. Oxxford Clothes, Inc., 109 F.3d 1070, 1080 (5th Cir. 1997)(refusing to hold that a series of phase-out agreements for third-parties using Exxon marks which were entered into in lieu of litigation constituted naked licensing)(emphasis original). The court relied

---

[31] A related decision evidencing the long recognition that assignments need not follow a set formula is Merry Hull & Co. v. Hi-Line Co., 243 F. Supp. 45, 51-52 (S.D.N.Y. 1965)(holding that purchase of a trademark in a bankruptcy sale, even without the purchase of the remainder of the assets, was a valid assignment where the purchaser immediately used some of the assets to make the same type of goods the liquidated debtor had made).

[32] The court upheld a settlement agreement that assigned to plaintiff and licensed-back to a third-party cheese shop the trademark "GALLO" even though the goods were different because the agreement actually solved a problem of consumer confusion.

on the defendant's failure to meet its burden in showing that there was a loss of trademark significance in Exxon's mark(s).[33]

The focus is not on "a formalistic transfer of bits and pieces of tangible assets," but the continuity of the goods. [34]  In protecting customers' legitimate expectation of continuity under the mark, no 'stereo-typed set of formalities' is required.[35]

      b.    <u>Savin Never Assigned Its Marks In Gross</u>

The clear language of the Assignment alleged by the Defendant states that Savin assigned its goodwill to Foothill[36] and provides for Savin's continuous use of the Assigned Marks on the same goods and services.[37] The Assignment provides:

> [Savin] assigns and conveys and transfers unto [Foothill] … upon the terms and conditions contained in the Agreements, and as security for payment and performance … all of [Savin's] right title and interest in, to and under the Trademarks, *together with the goodwill* … and the registrations thereof … provided, however, that until the occurrence … of Default, … [Savin] *shall be licensed* by [Foothill] to continue to use the Trademarks and Letters Patent in its business as if it had not made this Assignment.[38]

The defendant does not even allege that the Assigned Marks lost any significance as trademarks.  Moreover, Savin's continuous use specifically inured to the benefit of Foothill

---

[33] Even though <u>Exxon</u> focuses on naked licensing, rather than assignment-in-gross, it cites authority in cases addressing assignment-in-gross.  See <u>also</u> <u>The Money Store v. Harriscorp Finance, Inc.</u>, 689 F.2d 666, 678 (7th Cir. 1982)(stating that both sides cited cases holding the purpose of the law to be the same, to avoid confusion, and that no confusion resulted).

[34] <u>Archer Daniels Midland Co. v. Narula</u>, No. 99 C 6997, 2001 WL 804025 (N.D. Ill. July 12, 2001)(citing 2 McCarthy § 18:24, at 18-45 to 18-46).  McCarthy also states that "under the modern view, the assignment should be upheld if the transaction is such that the buyer is enabled to go on in real continuity with the past, either as evidenced in the tangible or intangible assets acquired … or by the buyer's post transaction conduct."  2 McCarthy § 18:24; <u>see also</u> <u>Glow Indus., Inc. v. Lopez</u>, 273 F. Supp.2d 1095, 1108 (C.D. Cal. 2003)(requesting further evidence on issue of whether an assignment and license-back constituted an invalid assignment-in-gross).

[35] <u>Id.</u>

[36] <u>See</u> Assignment at ¶ 2, Exhibit 1 to Einhorn Aff.

[37] <u>Id.</u>

[38] <u>Id.</u> (emphasis added).

pursuant to the terms of the Assignment.[39]  Foothill never licensed the Assigned Marks to any other entity.  The terms of the Assignment maintain the continuity of the goods and services and thereby protected consumers against confusion.  At all times, Savin was the sole and continuous source of the same goods and services provided under the Assigned Marks.

Typical of their loan transactions, Foothill entered into the Assignment and perfected its interest with the intent to create a security interest in the Assigned Marks[40], and to otherwise protect those marks for Savin.[41]  Any damage to the value of those marks would have been contrary to the interests of both Savin and its secured lender, Foothill.

3.     Defendant's Prior Discovery On This Point

Although the Defendant has already deposed Fishman, the Foothill loan officer responsible for the loan taken by Savin, the proposed counterclaim fails to even refer to the relevant facts stated by Fishman.  Fishman was unable to recall detailed information regarding the legal formalities of the transaction or the use and maintenance of the Assigned Marks.  For example:

> Q.     So just to confirm, you have no recollection of receiving Exhibit 3 [Combined Declaration of Use Under Sections 8 and 15 for the trademark SAVIN] and Exhibit 4 [Combined Declaration of Use and Incontestability Under Sections 8 and 15 for the trademark SAVINFAX] and don't recollect how they came to you to be signed or who sent them to you to be signed?
>
> A.     That's correct.
>
> MS. COHEN:     Sorry, but, you know, 10 years is 10 years, and it's not as important to him as it is to you at this point.
>
> ....
>
> Q.     Do you recall seeing this document [June 12, 1995 letter from Fishman to Thomas Salierno of Savin Corp.] before?

---

[39] Id. at ¶ 7.
[40] See Transcript at p. 12.
[41] See Transcript at p. 45.

A.    No, I don't.[42]

Defendant's deposition of Fishman, a person knowledgeable about the transaction, yielded no information supporting its claim.

Fishman did recall that the purpose of the assignment and license-back would be "to make sure that our security interests would have been perfected."[43] Foothill used the Assigned Marks through Savin, which at all times, continuously used them on the same goods of the same quality.[44]

The Defendant has not and cannot plead any facts supporting any allegation that the Assignment broke any continuity in the goods, that the Assigned Marks were not continuously used by Savin or that the Assigned Marks have lost any significance as trademarks.

4.    The Trademarks Have Never Been The Subject Of A Naked License

Plaintiffs will not be able to demonstrate a naked license in this case because of the straightforward language in the Assignment and the standard licensor/licensee relationship between Savin and Foothill discussed above. The Assignment states:

> Unless and until … an Event of Default … [Foothill] hereby grants to [Savin] the exclusive, royalty-free, nontransferrable right and license to … use … goods marked or identified by the Trademarks …. The parties agree that all use of the Trademarks by [Savin] shall inure to the benefit of [Foothill]. [Savin] agrees that for so long as this license shall remain in effect, [Savin] shall at all times maintain the quality of all goods marked or identified by the Trademarks. In furtherance of the license granted by [Foothill] to [Savin] pursuant to this paragraph, but solely in connection with the monitoring of the financing arrangements created by the Agreements, [Foothill] *shall have the right, no more than semi-annually, upon prior oral or written notice to [Savin], to examine, at [Savin's] expense, [Savin's] quality standards with respect to the manufacture, use and sale of goods marked or identified by the Trademarks*; provided, however, that [Savin] agrees that it shall be [Savin's] responsibility, and in no way [Foothill's], to maintain such quality standards at all times.[45]

---

[42] See Transcript at p. 31.
[43] See Transcript at p. 13.
[44] See Transcript at 47-48.
[45] See Assignment at Exhibit 1 to the Einhorn Aff. at ¶ 7 (emphasis added).

:716212-2                                    18

a.    The Savin Group bears a High Burden Of Proof

The Second Circuit has recognized that while "a naked or uncontrolled license may provide the basis for an *inference* of abandonment of a trademark ... a controlled license program will not." General Motors Corp. v. Gibson Chem. & Oil Corp., 786 F.2d 105, 110 (2d Cir. 1986)(citation omitted)(emphasis added). The critical question is whether the licensees' operations are policed adequately to maintain quality. Id. (citing Universal City Studios, Inc. v. Nintendo Co., 578 F. Supp. 911, 929 (S.D.N.Y. 1983), aff'd on other grounds, 746 F.2d 112 (2d Cir. 1984)).  The importance of maintaining the quality of products is to prevent consumer deception of the public. See Dawn Donut Co. v. Hart's Food Stores, Inc., 267 F.2d 358, 358 (2d Cir. 1959), citing, American Broadcasting Co. v. Wahl Co., 121 F.2d 412 (2d Cir. 1941)(plaintiff need only demonstrate that maintenance of the quality of goods was contemplated and reasonably assured).

There is no set minimum level of quality control, and abandonment, because it is a drastic remedy, which must proved with "clear and convincing evidence."[46]  The licensee also assumes a heavy burden because a defense of abandonment generally looks to the intent of the trademark owner.[47]  In Warner-Lambert Co. v. Schick U.S.A., Inc., 935 F. Supp. 130,144 (D. Conn. 1996), the focus was on the policing function and the court held that the "bald assertion"

---

[46] See Chestek at 12 (citing American Foods, Inc. v. Golden Flake, Inc., 312 F.2d 619, 624-25 (5th Cir. 1963)(stating that abandonment is in the nature of a forfeiture, therefore abandonment requires strict proof applicable in forfeiture cases); Taco Cabana Int'l v. Two Pesos, Inc., 932 F.2d 1113, 1121 (5th Cir. 1991)(calling standard "stringent"); Edwin K. Williams & Co. v. Edwin K. Williams & Co. – East, 542 F.2d 1053. 1059 (9th Cir. 1976)("Because a finding of insufficient control essentially works a forfeiture, a person who asserts insufficient control must meet a high burden of proof") and Winnebago Indus. Inc. v. Oliver & Winston, Inc., 207 U.S.P.Q. 335 (TTAB 1980)("it is also well settled that insofar as the question of abandonment of a mark is concerned, the burden is on petitioner to establish as a fact by clear and convincing proofs the abandonment of such mark by respondent."); McCarthy, at 17-14.2 to 17-15 (stating that the majority rule requires clear and convincing proof of abandonment, but the Federal Circuit only requires proof by the "preponderance of the evidence" standard).
[47] Carl Zeiss Stiftung v. V.E.B. Carl Zeiss, Jena, 293 F. Supp. 892, 917 (2d Cir. 1968).

that the plaintiff's quality control program was a sham was insufficient to meet the burden for abandonment.[48]

      b.    <u>Reasonable Reliance On The Licensee's Quality Control</u>

Licensors may reasonably rely on the integrity and reputation of a licensee. "where a history of trouble-free manufacture provides a basis for such reliance." <u>Syntex Lab., Inc. v. Norwich Pharm. Co.</u>, 315 F. Supp. 45,56 (S.D.N.Y. 1970) (emphasizing that "the purpose of the control requirement is to avoid the danger that the public may be deceived as to the quality of a product sold under a recognized name"). In <u>Syntex</u>, the marks were assigned and licensed-back. The licensor justifiably relied on the licensee's reputation, based on its previous inspection of the licensee's products in negotiating the license and the licensee's long manufacturing history. <u>Id</u>. Similarly, long use by the licensee, without complaint, prior to the license may be sufficient to show inspections were not necessary.[49]

Other cases cite <u>Syntex</u> in emphasizing the purpose of quality control provisions: to avoid deception of the public as to quality and courts should thus look to see that the agreement does not create a realistic danger of that deception.[50] The Ninth Circuit upheld an oral license from an inventor/manufacturer of transmission shift kits to another manufacturer.

---

[48] <u>Schick</u>, 935 F. Supp. at 144 (denying summary judgment based on naked licensing).

[49] <u>See</u> <u>Land O'Lakes Creameries, Inc. v. Oconomowoc Canning Co.</u>, 330 F.2d 667, 670 (7th Cir. 1964)(holding sufficient control existed where licensee sold product for 40 years without complaints about quality).

[50] <u>See</u> <u>e.g.</u>, <u>Dial-A-Mattress Operating Corp. v. Mattress Madness, Inc.</u>, 841 F. Supp. 1339, 1350 (E.D.N.Y. 1994)(citing <u>Syntex</u> for the proposition that the rules are not meant to invalidate assignments on stereotyped sets of formalities); <u>International Cosmetics Exchange v. Saba</u>, No. 00CV2280, 2001 WL 1944733, *18 (S.D. Fla. Oct. 19, 2001)(same); <u>Verson Wilkins Ltd. v. Allied Prods. Corp.</u>, 723 F. Supp. 1, 11 (N.D. Ill. 1989)(same); <u>First Interstate Bancorp v. Stenquist</u>, No. C-89-4106 MHP, 1990 WL 300321, *3-5 (N.D. Cal. July 13, 1990)(citing <u>Syntex</u> as another case in accord with the Ninth Circuit rule that only control sufficient to prevent deception is necessary and that the licensor may reasonably rely on the licensee's manufacturing history and the lack of complaints regarding quality); <u>Stockpot, Inc. v. Stock Pot Rest. Inc.</u>, 220 U.S.P.Q. 52, 60 (TTAB 1983)(holding that the agreement did not create a danger of deceiving the public as to quality where it licensed the marks to an employee of the restaurant owner familiar with the menu and who served the same menu and where the licensor lived upstairs from the restaurant and ran a gourmet shop next door).

Transgo, Inc. v. Ajac Transmission Parts Corp., 768 F.2d 1001, 1017 (9th Cir. 1985).  Because

the licensee was familiar with the licensee's business, there was lack of complaints about the

licensee's quality and the licensor had a history of policing its mark against third-party

infringers, the licensor justifiably relied on the licensee to perform his own quality control and

the license did not deceive the public. Id. at 1017-18 (citing Oberlin v. Marlin Am. Corp., 596

F.2d 1322, 1327 (7th Cir. 1979)).[51]

Similarly, a champagne distributor, even if it had no control over the quality of

the champagne it received from France and it sold the champagne to local (licensed) distributors,

was not engaging in naked licensing.  Schieffelin & Co. v. The Jack Co. of Boca, Inc., No. 89

Civ. 2941 (PKL), 1992 WL 156560, *5-6 (S.D.N.Y. June 28, 1992).  This holding, as in Transgo

& Syntex, makes clear that the mere lack of control is not the standard for a naked license.  Other

cases have held that the contractual right to control quality, even if never exercised, is enough to

meet the standard and defeat a defense of naked licensing.[52]

5.    The Assignment And License-Back Met All Requirements To Protect The Public
      From Confusion

Where the language of an agreement provides the necessary quality control

provisions, the defendant must overcome the plain language of the contract and provide evidence

of the lack of quality control. Glow Indus., Inc. v. Lopez, 273 F. Supp.2d 1095, 1111 (C.D. Cal.

---

[51] See also, Embedded Moments, Inc. v. International Silver Co., 648 F. Supp. 187, 194 (E.D.N.Y. 1986)(citing Syntex for the proposition that reliance on the integrity of a licensee may be sufficient and that "the requirement of control should be construed in light of the reason for the requirement and holding that a backgammon set manufacturer who permitted the licensor casinos the opportunity to review the set and the casinos' willingness to continue the license, if proven, would satisfy the control requirement); Printers Services, Inc. v. Bondurant, 20 U.S.P.Q.2d 1626, 1631 (C.D. Cal. 1991)(upholding a license based on the licensor's justifiable reliance on the licensee's reputation and integrity, the licensor's long term relationship with the licensee and the lack of consumer complaints)..
[52] Engineered Mech. Serv., Inc. v. Applied Mech. Tech., Inc., 584 F. Supp. 1149, 1159 (M.D. La. 1984)(finding that recital of right to control in licensing agreement was sufficient to avoid abandonment); Wolfies Rest., Inc. v. Lincoln Rest., Corp., 143 U.S.P.Q. 310, 311 (N.Y. Sup. Ct. 1964)(holding that so long as there was a license, inspection was not required).

2003).  The Assignment referenced in the Defendant's allegations contains a quality control provision.[53]  Savin always was the *only* party manufacturing goods bearing the Assigned Marks and it had been manufacturing them for a long period of time prior to the Assignment.  The provision actually assures that the goods would continue to be manufactured by the same manufacturer, thereby maintaining the same level of quality and causing no deception to the consuming public.

Additionally, the Defendant has deposed Fishman on the subject.[54]  He testified that Foothill's "Audit Group" inspected Savin's inventory during the term of the Assignment.[55]  He could not recall whether the quality of the goods was specifically inspected.[56]  Mere lack of recollection cannot be cited as a fact nor can it be used to render an entire trademark portfolio a nullity, especially where the intent of the agreements was to protect that portfolio.

Moreover, during his deposition, Fishman recalled that there were inspections of Savin's goods.  He said, "I didn't do audits where I would go and specifically look at the merchandise.  However, we did have an audit group that would."[57]  Without sufficient evidence to overcome the language in the relevant agreement, proper control must be assumed.  Id.

The Defendant has not and cannot not credibly allege that Foothill in fact did not adequately contemplate and reasonably control the quality of Savin's goods and services.  Additionally, the Defendant has not and cannot allege to any evidence that the public was at all deceived or that the Assigned Marks suffered any loss of trademark significance.  Indeed, the Defendant has failed to allege any instance of consumer complaints about quality.

---

[53] See Assignment at ¶ 7, Exhibit 1 to Einhorn Aff.
[54] See Memorandum in Support of Defendant's Motion for Leave to Amend the Answer and Add a Counterclaim at p. 2.
[55] See Transcript at 49-50.
[56] Id.
[57] See Transcript at p. 49.

The Defendant has not and cannot possibly meet its burden.  All the above facts demonstrate that the Assignment and license-back did not work an abandonment of the Assigned Marks, and Defendant's counterclaim would therefore be futile.

**V.**

**CONCLUSION**

Based on the foregoing, Plaintiff respectfully requests that the Court deny Defendant The Savin Center, P.C.'s Motion to Amend to Add Counterclaims in its entirety, together with such further relief that the Court deems just and equitable.

Dated: New York, New York
      February 18, 2004

By: _David A. Einhorn_
     David A. Einhorn (CT 09458)
     James M. Andriola (CT 22742)
     Anderson Kill & Olick, P.C.
     Two Sound View Drive
     Greenwich, Connecticut 06830
     (203) 622-7688
     - and -

     Anderson Kill & Olick, P.C.
     1251 Avenue of the Americas
     New York, New York  10022
     (212) 278-1000

     Attorneys for Plaintiff Savin Corporation

To:  Pamela S. Chestek, Esq.
     Cantor Colburn, LLP
     55 Griffin Road South
     Bloomfield, CT  06002

     -and-

     Jeffrey D. Friedman, Esq.
     Renne & Holtzman Public Law Group
     100 Pine Street,  CA  94111

     Attorneys for Defendant The Savin Center, P.C.

:716212-2