**EXHIBIT 4 TO AFFIRMATION**

1  need -- unless you're instructed by your attorney
2  not to answer the question, you still have to answer
3  the question even though it was objected to.
4        If you don't understand the question,
5  please just say so, and I'll be happy to rephrase it
6  in a way that's hopefully clear.
7        Please wait for the answer to be completed
8  before you start answering.  That's easier on the
9  stenographer so that she doesn't have to try to cope
10 with people interrupting each other.
11       Could you please -- can you please describe
12 for me what your current position is?
13    A.   I am the national originations manager at
14 Wells Fargo Foothill.  I run the front end of the
15 business in sales and underwriting.
16    Q.   And how long have you been in that
17 position?
18    A.   For approximately five years.
19    Q.   So that would be from about 1998?
20    A.   Approximately.
21    Q.   And what did you do before that?
22    A.   I was national underwriting manager.
23    Q.   Okay.
24    A.   For new business.
25    Q.   So you're national originations manager

```
 1  now; you were national underwriting before.
 2       A.   Correct.
 3       Q.   How long were you in that position?
 4       A.   Approximately two years.
 5       Q.   From about '96?
 6       A.   Right.
 7       Q.   Okay.  Prior to that?
 8       A.   I was a loan portfolio manager on the
 9  portfolio side managing credits.
10       Q.   Can you just describe for me a little more
11  what that does -- what that involves?
12       A.   It -- I had underneath me account
13  executives who would directly manage loans in our
14  portfolio, and I would manage those account
15  executives, basically overseeing the credit
16  relationships within our portfolio.
17       Q.   And so that was -- and when did you begin
18  that position?
19       A.   Probably approximately '94.
20       Q.   Sorry to have to go back so far, but we're
21  going back pretty far in time on this loan we're
22  going to be talking about a little later.
23            So before that?
24       A.   An account executive directly managing
25  credits.
```

8

1  Q.  And how long were you in that position?

2  A.  Since I began at Foothill in 1990.

3  Q.  So you joined Foothill in 1990?

4  A.  Correct.

5  Q.  So just so I'm clear, the relationship that
6  we're going to be talking about today, the lending
7  relationship that Foothill Capital Corporation had
8  with Savin Corporation, that -- Savin Corporation
9  obtained the loan before you were with Foothill.
10     Is that correct?

11 A.  Yes, I believe that's correct.

12 Q.  I understand you don't have documents in
13 front of you.  I'm not trying to trip you up.  I can
14 tell you it was in January '98.

15     MS. COHEN:  '98 or '88?

16 BY MS. CHESTEK:

17 Q.  I'm sorry.  '88.  So that was before you
18 were here.

19 A.  (Witness nods.)

20     MS. COHEN:  One of the things she didn't
21 tell you is you have to answer orally.  The reporter
22 can't take down nods of the head.

23     MS. CHESTEK:  Thank you.

24     THE WITNESS:  Put my head in a vice.

25     MS. COHEN:  You can nod as long as your

9

1  over.
2          With respect to the loan to Savin
3  Corporation, do you have any recollection of what
4  was done with trademarks and patents in that
5  transaction?
6      A.  Not being at Foothill at the time we
7  originally made the loan, I was not directly
8  involved in -- in perfecting our security interests
9  and the various assets.
10         However, I would believe Savin, being
11 typical of the loans we make, that we would have and
12 did perfect our security interests in most of the
13 assets including trademarks, but I was not involved
14 at that time in -- directly involved in closing the
15 loan originally.
16     Q.  Okay.  So would it be typical, in a senior
17 secured loan, that part of the property that was
18 secured was trademarks and patents?
19     A.  At that time it would have been typical.
20     Q.  Okay.  What documents would have been
21 prepared in order to receive a security interest and
22 perfect the security interest?
23     A.  I believe that we would have filed with the
24 patent and trademark -- copyright and trademark
25 offices in Washington, D.C., and I wouldn't

12

1  recollect all of the specific documents, but we
2  would have done what we felt like we needed to do to
3  make sure that our security interests were
4  perfected.
5       And my recollection is to perfect those
6  interests you'd have to file with the copyright and
7  trademark office in Washington.
8       Q.  Okay.  Is it fair to say that Foothill
9  Capital Corporation's only interest in trademarks
10 was a security interest?
11      MS. COHEN:  You mean Savin's trademarks?
12      MS. CHESTEK:  Correct.
13      MS. COHEN:  Objection.  Calls for a legal
14 conclusion.  Direct the witness not to give any
15 legal conclusions.  He's not a lawyer.  He can give
16 you his understanding about what Foothill's interest
17 was in those trademarks, but he can't give a legal
18 conclusion.  That's the issue in your lawsuit.
19      And yes, that's a direction not to answer,
20 just to make it clear.
21 BY MS. CHESTEK:
22      Q.  Is it your understanding that Foothill
23 Capital Corporation desired ownership of the Savin
24 Corporation trademarks in this transaction?
25      MS. COHEN:  Objection.  Since he wasn't

13

1  the loan to Savin Corporation of what Foothill's
2  interest was in the intellectual property of Savin
3  Corporation?
4          THE WITNESS:  My understanding is our
5  interest in the Savin intellectual assets were that
6  we filed the documentation we needed to file to
7  perfect our security interest against the
8  intellectual assets.
9  BY MS. CHESTEK:
10     Q.   Okay.  Thank you.
11          And Exhibit 3 and Exhibit 4 you also would
12  characterize as documents that were signed in order
13  to maintain the security interest in these
14  properties?
15          MR. HEALY:  Objection.
16          MS. COHEN:  If that's a question, I think
17  the question is were Exhibits 3 and 4 filed to
18  continue perfection or for some other purpose.
19          MS. CHESTEK:  To continue perfection.
20          THE WITNESS:  Not specifically recollecting
21  these documents, my assumption would be that these
22  documents were signed to continue our perfection
23  against the trademarks.
24  BY MS. CHESTEK.
25     Q.   Okay.

1  BY MS. CHESTEK:

2  Q.  So just to confirm, you have no
3  recollection of receiving Exhibit 3 and Exhibit 4
4  and don't recollect how they came to you to be
5  signed or who sent them to you to be signed?

6  A.  That's correct.

7  MS. COHEN:  Sorry, but, you know, 10 years
8  is 10 years, and it's not as important to him as it
9  is to you at this point.

10  MS. CHESTEK:  I completely understand that.
11  I have another exhibit which -- I think
12  we're up to Exhibit 5.

13  (Defendant's Exhibit No. 5 was marked
14  for identification and is annexed hereto.)

15  BY MS. CHESTEK:

16  Q.  Do you recall seeing this document before?
17  A.  No, I don't.
18  Q.  Is that your signature on it?
19  A.  Yes.
20  Q.  Do you know where you received this
21  document or who sent you this document?
22  A.  No, I don't.
23  MS. COHEN:  Actually he wrote the document.
24  It's a letter signed by him on Foothill letterhead.
25  So I'm not sure he would have received it from

31

1        MS. CHESTEK:  Can he answer?

2        MS. COHEN:  No, not when it calls for a
3   legal conclusion.  You see, he knows.
4   BY MS. CHESTEK:
5        Q.   Why didn't you license the Savin mark to
6   third parties, to someone other than Savin
7   Corporation?
8        MS. COHEN:  Objection.  Argumentative.
9        But that one you can answer.
10       THE WITNESS:  The Savin trademark was a
11  piece of collateral amongst many pieces of
12  collateral that we had in this loan, and the
13  collateral was securing a loan that was performed --
14  a performing loan, and there was no reason to try to
15  monetize any of the collateral securing the loan.
16  BY MS. CHESTEK:
17       Q.   If the loan was not performing, would you
18  have considered licensing the mark to third parties?
19       MS. COHEN:  Objection.  Calls for
20  speculation.  I direct him not to answer.  There may
21  be many, many factors that go into a lender's
22  decision on what to do or not to do with regard to
23  its collateral.
24       MS. CHESTEK:  Okay.
25       Q.   Are you familiar at all with Foothill

45

1   Capital Corporation's bookkeeping or accounting?

2       A.   It's a broad question.

3       Q.   Are you -- well, let me ask the question.

4            Do you know whether or not the goodwill of

5   the Savin marks ever appeared on the books of the

6   Foothill Capital Corporation?

7            MS. COHEN:  As an asset?

8            MS. CHESTEK:  Yes.  Or a liability, I

9   guess.

10           MR. HEALY:  Objection.

11           THE WITNESS:  I'm unaware that -- I'm

12  unaware that it did appear as an asset, but I can

13  confidently state that collateral that we perfect

14  our security in loans do not appear as assets on the

15  books of Foothill Capital or Wells Fargo Foothill.

16  BY MS. CHESTEK:

17      Q.   And you put the Savin trademarks in the

18  category of --

19           MS. COHEN:  Collateral.

20  BY MS. CHESTEK:

21      Q.   -- collateral.

22      A.   Yes.

23      Q.   So during -- just to establish a background

24  here, the assignment was assigned on January 13,

25  1988, and the loan to Savin Corporation was paid

46

1  off -- did you say mid '90s, you believed?
2     A.   Approximately.
3     Q.   Do you know whether or not Foothill Capital
4  Corporation owned the Savin trademarks during that
5  entire time period?
6     A.   From what period to what period are you
7  referring to?
8     Q.   From the time that the assignment was
9  signed until the release from the loan, the release
10 of the loan.
11    A.   When was the assignment signed?
12    Q.   January 13, 1988.
13    A.   I wasn't here from 1988 to 1990, so . . .
14    Q.   From 1990 until the loan was discharged,
15 did Foothill Capital Corporation own the Savin
16 trademarks as far as you know?
17        MR. HEALY:  Objection.
18        THE WITNESS:  I don't recall other than
19 what I specifically see in these documents presented
20 to me.
21 BY MS. CHESTEK:
22    Q.   And what do these documents tell you about
23 it?
24        MS. COHEN:  Objection.  Calls for
25 interpretation of a document, and it speaks for

47

1    itself. They speak for themselves.

2    BY MS. CHESTEK:

3        Q.   Would you have signed these documents if
4    Foothill Capital Corporation didn't own the
5    trademarks?

6            MS. COHEN: Objection. Calls for
7    speculation. Let me help you.

8            To the best of your knowledge, during the
9    period of time in which you managed this loan or
10   were associated with this loan, did Foothill Capital
11   sell the trademarks to anybody?

12           THE WITNESS: No.

13   BY MS. CHESTEK:

14       Q.   Did they dispose of the trademarks in any
15   other way? In other words, you don't have to just
16   sell them.

17       A.   Not to my knowledge.

18       Q.   So during this -- we're talking about a
19   five-year time period or so within your experience
20   at Foothill Capital Corporation.

21           During that time period do you ever recall
22   inspecting the merchandise marked with the Savin
23   brand?

24           MR. HEALY: Objection.

25           THE WITNESS: Could you be more specific to

48

```
 1   your question?
 2   BY MS. CHESTEK:
 3       Q.   Did you ever look at it to look at the
 4   quality of it?
 5            MS. COHEN:  Of the merchandise?
 6            MS. CHESTEK:  Yes.
 7            MR. HEALY:  Objection.
 8            MS. COHEN:  You can answer.
 9            THE WITNESS:  No, other than what I saw in
10   offices.  I didn't do audits where I would go and
11   specifically look at the merchandise.  However, we
12   did have an audit group that would.
13   BY MS. CHESTEK:
14       Q.   What would the audit group do?
15       A.   It would count inventory and inspect
16   inventory, more for quantity.
17       Q.   Did they inspect quality?
18       A.   No.
19       Q.   Savin Corporation -- did Savin Corporation
20   ever send you merchandise for your review?
21            MR. HEALY:  Objection.
22            MS. COHEN:  You mean like a copier?
23            MS. CHESTEK:  Yes.
24            THE WITNESS:  No.
25            MS. COHEN:  I think there's a point
```

1    necessary to clarify, and that is, the reason you
2    would -- the audit group would look at inventory to
3    count is because Foothill also had a lien on the
4    inventory.
5            Correct?
6            THE WITNESS:  Correct.
7            MR. HEALY:  I just want to note for the
8    record an objection just to any extent that counsel
9    is providing testimony on behalf of the witness,
10   just as a note for the record.
11           MS. COHEN:  I'm not providing any
12   testimony.  I'm just trying to clarify why it is
13   that they would have inspected inventory.
14           MR. HEALY:  Okay.
15   BY MS. CHESTEK:
16       Q.  Did Savin Corporation ever ask your
17   permission to manufacture a new product?
18       A.  Not that I recall.
19       Q.  Let me just restate the question so it's
20   clear.
21           Did Savin Corporation ever ask your
22   permission to manufacture new products that would
23   have the Savin name on it?
24       A.  Not that I recall, no.
25       Q.  Would Savin -- did Savin Corporation ever

50